UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

Law Htoo,

                                    Plaintiff,                              **Report and Recommendation**

            v.                                                                17-CV-745V

Jefferson B. Sessions, III, et al.,

                                    Defendants.

_____

## I.    INTRODUCTION

Plaintiff Law Htoo fled his native country of Myanmar (Burma) to escape what he perceived to be a threat of persecution.  For years before fleeing, plaintiff engaged in protest activities against the Burmese military dictatorship.  Plaintiff's activities included joining the related entities known as the Karen National Union and the Karen National Liberation Army ("KNLA" collectively).  After fleeing, plaintiff spent several years in Thailand and in refugee camps.  Plaintiff eventually found his way to Guam, where he received asylum in 2001.

Plaintiff's affiliation with the KNLA would have an impact on his life that continues to this day.  Plaintiff obtained permanent resident status in 2005 and applied for naturalization in 2010.  In 2016, defendants—the Attorney General, the Acting Director of the United States Citizenship & Immigration Services ("USCIS"), and the Acting Secretary of the Department of Homeland Security, all sued in their official capacities—denied the application for naturalization.  Defendants denied the application for naturalization because, in their view, plaintiff's activities with the KNLA constituted engagement in terrorist activity, a term of art in the immigration statutes that would make plaintiff ineligible for naturalization.  Defendants also believed that plaintiff engaged in acts of torture or extrajudicial killings while with the KNLA.

Plaintiff now has brought suit here under 8 U.S.C. § 1421(c) to challenge the denial of his naturalization application. After the parties agreed that the only discovery needed was the production of the administrative record (Dkt. No. 9), they cross-moved for summary judgment under Rule 56 of the Federal Rules of Civil Procedure ("FRCP"). (Dkt. Nos. 12, 14.) The parties agree that lawful adjustment to permanent resident status is a prerequisite to naturalization. The parties agree further that, as of 2005 when plaintiff applied for permanent resident status, the KNLA was a "Tier III" terrorist organization. From there, the parties diverge as to the importance of events that occurred in 2005 and later. Defendants argue that plaintiff never should have received permanent resident status in 2005 because of his KNLA affiliation, and that his permanent resident status, while officially granted, was not done so lawfully. Without lawful permanent resident status, according to defendants, plaintiff cannot adjust to naturalization. Plaintiff counters that defendants effectively are trying to void his status, and that permanent resident status, once given, cannot be voided without following the procedures for formal rescission. Plaintiff also points out that Congress removed the KNLA from the list of Tier III terrorist organizations in late 2007; plaintiff believes that the removal eliminates the only reason that defendants had to discount his permanent resident status as unlawful.

District Judge Lawrence J. Vilardo has referred this case to this Court under 28 U.S.C. § 636(b). The Court held oral argument on May 22, 2018. For the reasons below, the Court respectfully recommends granting defendants' motion and denying plaintiff's cross-motion.

## II.     BACKGROUND

### A.  Plaintiff protests the Burmese military and joins the KNLA

The background events leading up to this case trace all the way back to Burma in the 1960s.

Plaintiff is an ethnic Karen[1] who grew up in Burma in the 1960s and attended the equivalent of

elementary school in the 1970s.  (Dkt. No. 14-2 at 35.)  In his application for asylum, plaintiff

described the military takeover of Burma and how it eventually sparked democracy protests

(paragraph reprinted in full with original typographical errors):

> Due to the mismanagement of the military men led BSPP [Burma Socialist
> Programme Party], Burma became one of the 10 least development countries in the
> world in 1988 and 8888 students led nation wide prodemocracy movement uprising
> started to brake out in March 1988.  It started from Ko Phone Maw, RIT student
> was shot dead by the Burmese riot police.  11 students including myself were
> arrested at our school for one day in July 1988 and we were released after our fellow
> students about 300 from No. 1 state High School surrounding the police and
> demanding for release of 11 students.   Then all schools were closed. On the 8th of
> the August 1988, the people across the country took to the streets and demanding
> democracy, fundamental human rights, multi parties systems etc.,  At that time I was
> studying the secondary education (Tenth Standard) in State No. (1) high school, Pa-
> an town.  I actively participated in these demonstrations and carried out the duties
> given by the student leaders.

(*Id.* at 36.)  Plaintiff described also how he fled Burmese military authorities and joined the KNLA

(reprinted as in original):

> So the military authorities wanted us.  So, we fled from Pa-an led by the
> group of illegal antique sellers and by the help of villagers those who lived in
> borderline.  We climbed the Daw Na Mountain then we reached K.N.U camp on 25
> September 1988.  We hat to walk for 4 days to reach the KNU controlled area at
> Thai-Burma border.  On the 5th day, we arrived the student reception center camp.
> The camp name is Mel Ta Yae.  When we arrived there, we saw some students, they
> arrived there before us.  We students gathered together in one group and we had to
> attend the basic military training and physical training courses about two weeks.
> After I finished the training I decided to join K.N.U. and asked the leader of
> K.N.L.A, captain T____ to helpe me and he arranged and sent me to Mar Ner Plaw,
> the General Headquarters of the KNU and all pro-democracy movement

---

[1] Without making any findings, the Court notes for background purposes that the Karen people are a distinct
ethnic group with a culture, language, and heritage that predates British occupation.  *See, e.g.,* Jay Milbrandt,
*Tracking Genocide: Persecution of the Karen in Burma,* 48 Tex. Int'l L.J. 63, 83 (2012).

organisations.  I arrived there in the middle of October, 1988.  Then I had to go to Mae Tha Wall as an ordinary volunteer soldier.  We had to defense and fight back the Burmese Army's attack at the Mal Pop mountain, the south of Mae Tha Wall.  It was the first experience of real battle for me as a Karen freedom fighter.  When I was a student I had to run and hide in the jungles.

(*Id.* at 37.)  Later in his asylum application, plaintiff discussed his training as a radio mechanic:

My father was arrested again by the Burmese military intelligent at hometown, Pa-an soon after he had arrived.  They investigated him and they saw many scars on his body, then he was released.  But the Burmese dictators always keep their eyes on my father and find out whether he had contact with me or not.  When my father went back I was baptized at Mar Ner Plew.  Then I attended Radio Mechanic Course in May 1989 and right there I learnt electronic-electricity courses, basic military training and communication media.  These courses were opened during the raining season.  During the summer and winter seasons we have to defense the Burmese Army's offensive attack against the KNU.  I had to join the K.N.L.A operation in regiment (20) in March 1990 and some operations at Hpa-pon and the No. 3 Lieutenant Training's practical field training near the Hpa-pon district.  We attacked and occupied Lal Toe SPDC military base camp and Wa Bow Kyow mountain.  We besieged about 500 Burmese Army for nearly one month at Phaw Hta in July 1991.

I finished my (R.M) Training in October 1991 by learning and fighting.  Major W_____ assigned me as a (R.M) soldier at the Head quarter of K.N.L.A lead.  Our column is (Democratic Alliance of Burma), combined with K.N.U, A.B.S.D.F and other ethnic revolutionary groups.  We have the duty around Tha Htone district, to attack the convoy of Burmese Army, their columns, and to stop their communication for front line soldiers.

(*Id.* at 38.)  Plaintiff later had to renew his radio mechanic training:

After finished that course, for me no need to go to front line, still behind and operated the radio communication machines, electric light, phones and so on at the Mar Ner Plaw.  During that time two of my friends were caught and K.N.U intelligent thought that they are dictators of Burmese Army came and investigated here.  Therefore two of them were beaten and asked many questions by K.N.U intelligent.  When I saw that event I got angry and Commander B_____ released them, from K.N.U Head Quarters.

(*Id.* at 39.)

4

### B. *Plaintiff seeks and receives asylum in the United States*

As time passed, again according to his asylum application, plaintiff grew disillusioned with

KNLA leaders and decided that he could not live in Burma safely anymore.  Plaintiff fled Burma

and, between approximately 1995 and 2000, lived in Thailand or in various refugee camps along the

Thai-Burmese border.  (*See generally id.* at 40–41.)  Plaintiff eventually found a way to reach Guam.

On December 8, 2000, plaintiff filed a Form I-589 application for asylum.  (*Id.* at 24.)  Plaintiff

provided information in numerous places on his application concerning his activities with the

KNLA; the following excerpt captures the essence of his desire for asylum:

> I cannot go back Burma (Myanmar) which being governed by the notorious
> military regime so-called SPDC (SLORC) because of fear of persecution for my
> involvement in the strike, demonstrations, joining the KNU freedom fighters,
> ABSDF arm wings group and helping the NCGUB ministers in Bangkok office.
> Moreover the SPDC intelligent knows everyone who participated actively in 8888
> uprising and disappears after the military coup on 18 September 1988.  Because of
> the May 1990 new record of registration for population, they know me very well.
>
> I am willing to continue my unfinished education if I am allowed to stay in
> your country.  I have realized that living in Thailand is not only no grantee for my
> future but also no chance to continue my study.
>
> Therefore, I can't go back to Burma if I must return, my life will not safe.
> My life in there is not secure by all unpleasant possibilities and I can not stand on
> this life no more and I would like to build up my life peacefully there and I would
> like to go on my education which was restrained by political correction in Burma.
>
> Now I come to Guam and ask the permission to the most famous
> Democracy country (U.S.A) on the world as a refugee, by the help of my friends
> those who already arrived in USA.

(*Id.* at 41.)  Immigration authorities interviewed plaintiff on April 13, 2001 and granted him asylum

on May 29, 2001.  (*Id.* at 24.)

### C. *Plaintiff seeks and receives permanent resident status*

On July 20, 2004, plaintiff filed a Form I-485 application for adjustment to permanent

resident status.  (*Id.* at 17.)  In the application, plaintiff indicated that immigration officials granted

him asylum on May 29, 2001. (*Id.*)  Plaintiff also disclosed his membership in the KNLA from January 1989 to April 1995. (*Id.* at 18.)  Immigration authorities approved the application and granted plaintiff permanent resident status on March 25, 2005, as a principal asylee in immigrant classification AS6. (*Id.* at 8.)

### D. Plaintiff seeks naturalization but is denied

On July 24, 2010, plaintiff filed a Form N-400 application for naturalization to become a United States citizen. (*Id.* at 10.)  Plaintiff again disclosed his former affiliation with the KNLA. (*Id.* at 12.)  As part of the application, defendants interviewed plaintiff on October 18, 2010 and November 3, 2016. (*Id.* at 15, 16.)

On December 7, 2016, defendants issued a decision denying plaintiff's naturalization application. (*Id.* at 7.)  The sole reason for the denial concerned plaintiff's permanent resident status. Even though plaintiff formally had permanent resident status, defendants decided that he was inadmissible at the time of his application for that status—telling him, in effect, that he never should have received permanent resident status in the first place.  Defendants considered plaintiff inadmissible for two reasons.  First, defendants decided that plaintiff had engaged in terrorist activity[2] through his time with the KNLA, making him inadmissible under 8 U.S.C. § 1182(a)(3)(B)(i)(I). (*Id.* at 8.)  Defendants specified that the terrorist activity in question consisted of "providing material support to a Tier III terrorist organization."  (*Id.*); *see also* 8 U.S.C. § 1182(a)(3)(B)(iv)(VI)(dd).  Second, defendants decided that plaintiff "committed, incited, assisted, or otherwise participated in the commission of acts of torture or extrajudicial killings," making him

---

[2] "Terrorist activity" is defined in 8 U.S.C. § 1182(a)(3)(B)(iii).  The Court will discuss the definition in more detail later as needed.

inadmissible under 8 U.S.C. § 1182(a)(3)(E)(iii).  Plaintiff appealed the denial of his application, but

defendants affirmed the denial on May 22, 2017.  (*Id.* at 3.)

### E.  Plaintiff commences this litigation

Plaintiff began this litigation by filing a complaint on August 2, 2017.  (Dkt. No. 1.)  The

parties agreed that the case would require little discovery beyond production of the administrative

record.  (Dkt. No. 9.)  Accordingly, the parties have proceeded directly to dispositive motions.

Plaintiff seeks summary judgment for a few related reasons, all of which address his

perception that "the government appears to be arguing that plaintiff's adjustment of status should

somehow be retroactively rescinded."  (Dkt. No. 12-1 at 4.)  Plaintiff argues that his permanent

resident status, once granted, cannot be undermined by any sort of governmental hindsight:

> There is simply no basis for the government's claims that his lawful
> permanent resident status was erroneously granted.  If so, then the terrorism
> restriction was simply ignored twice by USCIS and there is no evidence to support
> this supposition.
>
> In fact, the government provides little support for this supposition.  It is just
> as possible that respondent's application for lawful permanent residence should be
> considered to have been appropriately approved.
>
> The government has not provided sufficient documentation to demonstrate
> that an error was made.  This is simply not the case where an applicant for
> adjustment had not filed a required form or had not affirmatively taken some other
> action that was required to obtain lawful permanent resident status.  Waivers of the
> terrorism were and could have been granted.  There is simply no way of knowing
> whether plaintiff's adjustment was in compliance with or contrary to law.  *Ay v.
> Holder*, 742 F.3d 317 (2d Cir. 2014) (discussing various waivers of the terrorism bar,
> including intra-agency waivers, and the fact that the procedures for seeking those
> waivers were unclear to the Court).
>
> Moreover, the fact that an error may have been made, that is not the end of
> the inquiry.  "The law plainly states that, once granted, LPR status sticks; if the CIS
> later realizes that the alien was actually ineligible for that adjustment in status at the
> time of granting (i.e. it was granted erroneously) then it must follow the formal
> procedure for revocation or rescission.  *See* 8 C.F.R. § 246.1 ('If it appears to a
> district director that a person residing in his or her district was not in fact eligible for
> the adjustment of status made in his or her case [then the listed procedures are to be

followed].') (emphasis added).  This strongly suggests that there is only one way to set aside a grant, even an erroneous grant, of LPR status—a formal rescission proceeding.  Simply ignoring LPR status after it is granted, as the CIS did in its decisions on the Agarwals' applications, and as the agency urges this Court to do here, is inappropriate." *Agarwal v. Napolitano*, 663 F. Supp. 2d 528, 539 (W.D. Tex. 2009).

(Dkt. No. 17 at 3–4.)  Plaintiff also asserts that the Consolidated Appropriations Act of 2008 ("CAA"), Pub. L. No. 110–161, 121 Stat. 1844 (2007), removed the KNLA from the list of terrorist organizations that would make an applicant inadmissible.  Plaintiff asserts further that regulations issued pursuant to the CAA clarified that any activities related to the KNLA no longer would be disqualifying, as long as the activities were not directed at non-combatants:

> In the government's affirmance of their first denial, they acknowledged the CAA, but argued that individuals engaging in certain terrorist activities for any of the groups covered by the CAA should still be considered inadmissible.  They then listed many sections of 212(a)(3)(B) of the INA that they posit still warrant a finding that plaintiff was erroneously granted his permanent residence.  (See, Decision attached hereto as Appendix A, p 2-3/Govt. 00010-00011).

> This argument is meritless because it completely ignores federal regulations promulgated on June 18, 2008 pursuant to the CAA.  Those regulations specifically state "that section 212(a)(3)(B) of the INA, excluding subclause i(II)2 shall not apply with respect to an alien not otherwise covered by the automatic relief provisions of Section 691(B) of the CAA, for any activity or association relating to the Karen National Union/Karen National Liberation Army (KNU/KNLA), provided there is no reason to believe that the relevant terrorist activities of the alien or the recipients were targeted against noncombatant persons" (emphasis added).  73 Fed. Reg. 34771 (June 18, 2008) (Appendix B).

(Dkt. No. 12-1 at 5–6.)

Through their cross-motion, defendants seek summary judgment for themselves.  The principal point that defendants make is that naturalization has lawful permanent residence as a prerequisite, and that plaintiff never satisfied that prerequisite:

> Plaintiff cannot meet this burden because he was inadmissible, as a matter of law, when he obtained permanent residency in 2006 under INA § 212(a)(3)(B)(i)(I), 8 U.S.C. 1182(a)(3)(B)(i)(I) for engaging in terrorist activity, as defined in INA § 212(a)(3)(B)(iv)(VI)(dd), 8 U.S.C. 1182(a)(3)(B)(iv)(VI)(dd) for providing material

support to a Tier III terrorist organization, and under INA § 212(a)(3)(E), 8 U.S.C. 1182(a)(3)(E) for having committed, incited, assisted, or otherwise participated in the commission of acts of torture or extrajudicial killings. The KNLA met the definition of a Tier III terrorist organization under INA § 212(a)(3)(B)(vi)(III), 8 U.S.C. 1182(a)(3)(B)(vi)(III) during the time plaintiff served as a soldier with the army between 1988 and 1995. Okereke Decl., Ex. A, at p. 8. Plaintiff's participation in battles as a soldier against the Burmese government and service as a radio mechanic for the KNLA were, therefore, considered engaging in terrorist activities, providing material support to a terrorist organization, and committing, inciting, assisting or otherwise participating in the commission of acts of extrajudicial killings.

These actions barred plaintiff from obtaining permanent residency status and he, therefore, cannot establish that he met the statutory requirements for legal permanent residency. And, that USCIS granted permanent residency—even if by mistake—is not a basis for demonstrating that "lawful permanent residency" was granted in accordance with all applicable provisions of the INA. *See Turfah v. United States Citizenship and Immigration Services*, 845 F.3d 668 (6th Cir. 2017). (An alien is not "lawfully admitted," as required to establish eligibility for naturalization, if he gains lawful permanent residence (LPR) status due to a mistake by the government, even if the alien did not commit any fraud in obtaining that status.)

(Dkt. No. 14-5 at 11–12.) Defendants carry their argument about a missing prerequisite into an argument that the CAA neither fills in the missing prerequisite nor exempts all grounds of inadmissibility:

The CAA does not, however, include language mandating that an alien be granted naturalization or otherwise negate the statutory prerequisites required to obtain citizenship—including that an individual *must* have gained lawful permanent residency and demonstrate that he did so pursuant to all applicable provisions of the INA. As set forth herein, *supra* III.A and III.B, plaintiff cannot do so because at the time he obtained permanent residency he was inadmissible based on his participation in the KNLA.

Moreover, the CAA does not exempt *all* grounds for terrorist-related inadmissibility; but, only those where "terrorist organization" is an element of the grounds of inadmissibility. These grounds include circumstances where an alien:

- Solicited funds or other things of value on behalf of one of the named groups in the CAA (INA section 212(a)(3)(B)(iv)(cc), 8 U.S.C. 1182(a)(3)(B)(iv)(cc));

- Solicited an individual for membership in one of the named groups (INA section 212(a)(3)(B)(iv)(V)(cc), 8 U.S.C. 1182(a)(3)(B)(iv)(V)(cc));

9

• Committed an act that provided material support to one of these named groups (INA section 212(a)(3)(B)(iv)(VI)(dd), 8 U.S.C. 1182(a)(3)(B)(iv)(VI)(dd));

• Is a representative of one of the named groups (INA section 212(a)(3)(B)(i)(IV)(aa), 8 U.S.C. 1182(a)(3)(B)(i)(IV)(aa));

• Is a member of one of the named groups (INA section 212(A)(3)(B)(i)(VI), 8 U.S.C. 1182(A)(3)(B)(i)(VI));

• Persuaded others to support one of the named groups (INA section 212(a)(3)(B)(i)(VII), 8 U.S.C. 1182(a)(3)(B)(i)(VII)); or

• Received military-type training from one of the named groups (INA section 212(a)(3)(B)(i)(VIII), 8 U.S.C. 1182(a)(3)(B)(i)(VIII)).

Okereke Decl., Ex. A, at p. 4 (USCIS Reaffirmation of Decision to Deny Plaintiff's Naturalization Application).  Plaintiff's inadmissibility, notably, was not limited to the above grounds, but as well included inadmissibility based on engaging in terrorist activities and for having committed, incited, assisted, or otherwise participated in the commission of acts of torture or extrajudicial killings.  The CAA, thus, would not have provided plaintiff with the relief he now seeks.

(Dkt. No. 14-5 at 13–14.)

## III.   DISCUSSION

### A.  Motions for summary judgment generally

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FRCP 56(a).  "As to materiality, the substantive law will identify which facts are material.  Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment . . . . More important for present purposes, summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted).  "The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists.  In determining whether a genuine issue of

material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant . . . . Summary judgment is improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted).

Here, the Court can adjudicate both the cross-motions and the entire case as a matter of law. The Court reviews denials of naturalization applications *de novo*, under 8 U.S.C. § 1421(c). The parties have agreed that discovery essentially began and ended with production of the administrative record, which defendants have included in the case docket. The Court has reviewed the administrative record and finds no disputes about factual events or witness credibility that a jury would have to resolve. As explained below, the case turns on how specific provisions of immigration law apply to the undisputed administrative record. The ultimate burden rests with plaintiff. *See* 8 C.F.R. § 316.2(b) ("The applicant shall bear the burden of establishing by a preponderance of the evidence that he or she meets all of the requirements for naturalization, including that the applicant was lawfully admitted as a permanent resident to the United States, in accordance with the immigration laws in effect at the time of the applicant's initial entry or any subsequent reentry.").

### B. Requirements for naturalization

The Court will begin its substantive analysis by reviewing the requirements for naturalization:

> No person, except as otherwise provided in this subchapter, shall be naturalized unless such applicant, (1) immediately preceding the date of filing his application for naturalization has resided continuously, *after being lawfully admitted for permanent residence*, within the United States for at least five years and during the five years immediately preceding the date of filing his application has been physically present therein for periods totaling at least half of that time, and who has resided within the State or within the district of the Service in the United States in which the applicant filed the application for at least three months, (2) has resided continuously

11

> within the United States from the date of the application up to the time of admission
> to citizenship, and (3) during all the periods referred to in this subsection has been
> and still is a person of good moral character, attached to the principles of the
> Constitution of the United States, and well disposed to the good order and happiness
> of the United States.

8 U.S.C. § 1427(a) (emphasis added); *see also* 8 U.S.C. § 1429 ("Except as otherwise provided in this subchapter, no person shall be naturalized unless he has been lawfully admitted to the United States for permanent residence in accordance with all applicable provisions of this chapter."); 8 C.F.R. § 316.2(a)(2) ("Except as otherwise provided in this chapter, to be eligible for naturalization, an alien must establish that he or she . . . Has been lawfully admitted as a permanent resident of the United States . . . ."). Of the requirements for naturalization set forth in the statute, the only one in dispute here is the one that mandates lawful permanent residence status. Defendants' position points the Court to the next step that it should take: what to make of the undisputed documentation that plaintiff has that, on its face, conferred permanent resident status on him in 2005.

### C. Does plaintiff have lawful permanent resident status?

Before the Court can go any farther in its analysis, it needs to determine whether plaintiff achieved lawful permanent resident status in 2005 and, if not, what that might mean for plaintiff now.

#### i. Plaintiff's permanent resident status in 2005

The basic principle behind adjustment to lawful permanent resident status, under plaintiff's circumstances, is straightforward:

> The Secretary of Homeland Security or the Attorney General, in the
> Secretary's or the Attorney General's discretion and under such regulations as the
> Secretary or the Attorney General may prescribe, may adjust to the status of an alien
> lawfully admitted for permanent residence the status of any alien granted asylum
> who—
>
> (1) applies for such adjustment,

(2) has been physically present in the United States for at least one year after being granted asylum,

(3) continues to be a refugee within the meaning of section 1101(a)(42)(A) of this title or a spouse or child of such a refugee,

(4) is not firmly resettled in any foreign country, and

(5) is admissible (except as otherwise provided under subsection (c)) as an immigrant under this chapter at the time of examination for adjustment of such alien.

Upon approval of an application under this subsection, the Secretary of Homeland Security or the Attorney General shall establish a record of the alien's admission for lawful permanent residence as of the date one year before the date of the approval of the application.

8 U.S.C. § 1159(b).  The undisputed administrative record here shows that plaintiff followed these steps.  On or about July 20, 2004, plaintiff filed Form I-485, an application for adjustment of status for asylees under circumstances such as his.  (Dkt. No. 14-2 at 17–20.)  Where the application asked plaintiff to disclose political affiliations, he listed "Karen State" and "Karen National Union."  (*Id.* at 18.)  Defendants subsequently granted the application and adjusted plaintiff's status to a permanent resident.  The parties have not submitted any information or made any arguments that would put these basic facts in question.  Consequently, the Court concludes that, at least on the face of the paperwork, plaintiff did in fact receive permanent resident status in 2005 and is currently listed as a permanent resident.

ii.    *Permanent resident status and lawfulness*

While the immigration process does have extensive procedures in place to obtain or to verify information independently of an applicant for permanent resident status, a big part of the process always will be self-reporting.  Self-reporting, naturally, creates incentives to shade information, to exaggerate, to omit potentially disqualifying information, or to lie through flat-out fabrications.

13

What happens when an applicant is caught with potentially disqualifying information after the conferral of permanent resident status?

The answer reveals a point on which the parties here are talking past each other somewhat. With respect to daily living and possible expulsion from the country, the answer to the question of erroneous conferral of permanent resident status is rescission. Provisions of the immigration statutes and regulations set forth a procedure by which immigration authorities can serve notice of an intent to rescind adjustment of status; the person in question then can follow certain procedures to respond. *See generally* 8 U.S.C. § 1256; 8 C.F.R. § 246.1. Plaintiff has alluded to the rescission procedure when he has argued that permanent resident status "sticks" once it is given, unless it is taken away through proper procedure. (*See* Dkt. No. 17 at 4.) To further his point, plaintiff has quoted extensively from *Agarwal v. Napolitano*, 663 F. Supp. 2d 528 (W.D. Tex. 2009). *Agarwal* is distinguishable from this case for a few related reasons. Unlike what is alleged here, the plaintiffs in *Agarwal* did nothing wrong—the government argued that the permanent resident status was defective because of its own misconduct in failing to notify the Agarwals of a certain enhanced fee requirement. Additionally, the government in *Agarwal* actively sought rescission of the permanent resident status in conjunction with the denial of a naturalization application. *See, e.g., Bertos v. Napolitano*, No. 5:12-CV-3531-RMW, 2013 WL 1435480, at *6 (N.D. Cal. Apr. 9, 2013) (distinguishing *Agarwal*). Here, at least for now, defendants have said nothing about trying to rescind plaintiff's permanent resident status. *See Sharkey v. Quarantillo*, 541 F.3d 75, 93 (2d Cir. 2008) (recognizing the rescission procedure, and the lawfulness of an adjustment to permanent residence, as different issues).

What defendants are arguing for now—and what *Agarwal* does not address—is that plaintiff's permanent resident status, though officially recorded, was not *lawful*. The meaning of

14

"lawful" matters here because the naturalization statute does not require only a recording of permanent resident status. The statute requires "being *lawfully* admitted for permanent residence." "The term 'lawfully admitted for permanent residence' means the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws, such status not having changed." 8 U.S.C. § 1101(a)(20). "The natural reading of 'lawful' connotes more than just procedural regularity; it suggests that the substance of an action complied with the governing law." *De La Rosa v. U.S. Dep't of Homeland Sec.*, 489 F.3d 551, 554 (2d Cir. 2007) (citations omitted). "[T]o be 'lawfully admitted for permanent residence' an alien must have complied with the substantive legal requirements in place at the time she was admitted for permanent residence." *Id.* at 555. Where an alien follows all of the necessary procedures for an adjustment of status and has no disqualifying characteristics, governmental administrative oversight will not negate an otherwise lawful adjustment. *See Vargas-Ortiz v. McCarthy*, No. 1:14-CV-00393-CWD, 2016 WL 707340, at *15 (D. Idaho Feb. 22, 2016). Administrative oversight, however, cannot paper over a failure to comply with substantive legal requirements. *See Villafana v. Holder*, 358 F. App'x 245, 246 (2d Cir. 2009) (summary order) (citing *De La Rosa* and noting that "even for those who obtained their LPR status by mistake rather than fraud, if petitioner fails to demonstrate that he or she had complied with the relevant substantive legal requirements at the time petitioner was admitted for permanent residence, then petitioner was never 'lawfully admitted for permanent residence'"); *see also Turfah v. United States Citizenship & Immigration Servs.*, 845 F.3d 668, 672 (6th Cir. 2017) (collecting cases on the lawful-admission requirement); *Segura v. Holder*, 605 F.3d 1063, 1067 (9th Cir. 2010) ("We therefore reaffirm our agreement with our sister circuits, which have placed emphasis on the alien's compliance with the underlying requirements in addition to the method through which the alien obtained his permanent resident status.") (citations omitted).

### iii. Did Plaintiff engage in terrorist activity?

"This, then, leads to the core of the issue. For the government to show that [plaintiff]'s LPR status was substantively defective, it must point to some substantive defect at the time [he] received it." *Ampe v. Johnson*, 157 F. Supp. 3d 1, 10 (D.D.C. 2016). As noted above, defendants considered plaintiff inadmissible for two reasons. The Court will address each reason in turn.

The Court first will address defendants' decision that plaintiff had engaged in terrorist activity by providing material support to a Tier III terrorist organization. There are a few nested statutory references to unpackage here. Under the main statutory provision in question, "[a]ny alien who has engaged in a terrorist activity . . . is inadmissible." 8 U.S.C. § 1182(a)(3)(B)(i)(I). The statute then defines the phrase "engage in terrorist activity":

> As used in this chapter, the term "engage in terrorist activity" means, in an individual capacity or as a member of an organization . . . to commit an act that the actor knows, or reasonably should know, affords material support, including a safe house, transportation, communications, funds, transfer of funds or other material financial benefit, false documentation or identification, weapons (including chemical, biological, or radiological weapons), explosives, or training . . . to a terrorist organization described in clause (vi)(III), or to any member of such an organization, unless the actor can demonstrate by clear and convincing evidence that the actor did not know, and should not reasonably have known, that the organization was a terrorist organization.

8 U.S.C. § 1182(a)(3)(B)(iv)(VI)(dd). Clause (vi)(III), in turn, is the "Tier III" clause and defines a "terrorist organization" as "a group of two or more individuals, whether organized or not, which engages in, or has a subgroup which engages in, the activities described in subclauses (I) through (VI) of clause (iv)." 8 U.S.C. § 1182(a)(3)(B)(vi)(III). Here, plaintiff himself has described how he completed radio mechanic training both to facilitate KNLA communications and to hinder Burmese Army communications. (Dkt. No. 14-2 at 38.) Plaintiff operated radio communication equipment as well as equipment that helps with lighting and telephones. (*Id.* at 39.) Because plaintiff has elected to pursue other arguments, he has not contested that his actions provided material

16

communication support to two or more individuals as described in the statute cited above. The

Court agrees with defendants that plaintiff's actions met the statutory definition for engaging in

terrorist activity. Plaintiff thus would have been inadmissible in 2005, and his permanent resident

status would be unlawful, unless a saving provision like the CAA applied.

> iv.    Did Congress absolve plaintiff from inadmissibility for terrorist activity?

The heart of plaintiff's motion is that the analysis that the Court explained above is not the

end of the story. On December 26, 2007, President George W. Bush signed the CAA into law.

Section 691(b) of the CAA interpreted an immigration provision that is central to the first reason

why defendants considered plaintiff's permanent resident status unlawful. Section 691(b) reads in its

entirety as follows:

> For purposes of section 212(a)(3)(B) of the Immigration and Nationality Act
> (8 U.S.C. 1182(a)(3)(B)), the Karen National Union/Karen Liberation Army
> (KNU/KNLA), the Chin National Front/Chin National Army (CNF/CNA), the
> Chin National League for Democracy (CNLD), the Kayan New Land Party (KNLP),
> the Arakan Liberation Party (ALP), the Mustangs, the Alzados, the Karenni National
> Progressive Party, and appropriate groups affiliated with the Hmong and the
> Montagnards shall not be considered to be a terrorist organization on the basis of
> any act or event occurring before the date of enactment of this section. Nothing in
> this subsection may be construed to alter or limit the authority of the Secretary of
> State or the Secretary of Homeland Security to exercise his discretionary authority
> pursuant to section 212(d)(3)(B)(i) of the Immigration and Nationality Act (8 U.S.C.
> 1182(d)(3)(B)(i)).

Pub. L. No. 110–161, § 691(b), 121 Stat. 1844. The plain language of Section 691(b) addresses

certain "acts or events" in an applicant's life that might lead to inadmissibility by themselves.

Section 691(b) is ambiguous about prior administrative proceedings. A few months later, the

Department of Homeland Security and the Department of State issued a joint determination that

interpreted Section 691(b) as follows:

> [S]ection 212(a)(3)(B) of the INA, excluding subclause (i)(II), shall not apply with
> respect to an alien not otherwise covered by the automatic relief provisions of
> section 691(b) of the CAA, for any activity or association relating to the Karen

17

National Union/Karen National Liberation Army (KNU/KNLA), provided that there is no reason to believe that the relevant terrorist activities of the alien or the recipients were targeted against noncombatant persons, and further provided that the alien satisfies the relevant agency authority that the alien:

(a) Is seeking a benefit or protection under the INA and has been determined to be otherwise eligible for the benefit or protection;

(b) Has undergone and passed relevant background and security checks;

(c) Has fully disclosed, in all relevant applications and interviews with U.S. government representatives and agents, the nature and circumstances of each activity or association falling within the scope of section 212(a)(3)(B) of the INA;

(d) Poses no danger to the safety and security of the United States; and

(e) Is warranted to be exempted from the relevant inadmissibility provision by the totality of the circumstances.

Implementation of this determination will be made by U.S. Citizenship and Immigration Services (USCIS), in consultation with U.S. Immigration and Customs Enforcement (ICE), or by U.S. consular officers, as applicable, who shall ascertain, to their satisfaction, and in their discretion, that the particular applicant meets the criteria set forth above.

U.S. Dep't of Homeland Sec., Exercise of Authority Under Section 212(d)(3)(B)(i) of the

Immigration and Nationality Act, 73 Fed. Reg. 34771-01 (June 18, 2008). U.S. Citizenship and

Immigration Services soon issued a memorandum to provide implementation guidance for

immigration applications affected by the CAA. The memorandum included the following language

to address the ambiguity in Section 691(b) concerning prior administrative proceedings:

Decisions issued prior to the enactment of the CAA denying or referring an application because the alien was inadmissible based on one or more terrorist inadmissibility ground(s) that are now inapplicable as a result of the passage of section 691(b) stand, unless reopened by the component with jurisdiction over the adjudication. USCIS adjudicators should favorably consider any reapplication or motion to reopen or reconsider an application previously denied or referred because of a terrorist inadmissibility ground that is now inapplicable, unless other reasons for denial or referral of the application remain applicable. USCIS adjudicators should also favorably consider any fee waiver request.

U.S. Citizenship & Immigration Servs., Implementation of Section 691 of Division J of the Consolidated Appropriations Act, 2008, and Updated Processing Requirements for Discretionary Exemptions to Terrorist Activity Inadmissibility Grounds, 2008 WL 3021079, at *5 (July 28, 2008). The Court gives some deference to these departments and agencies, owing to their expertise in managing immigration affairs daily. *See I.N.S. v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999) ("[W]e have recognized that judicial deference to the Executive Branch is especially appropriate in the immigration context where officials exercise especially sensitive political functions that implicate questions of foreign relations.") (internal quotation marks and citation omitted); *cf. Coeur Alaska, Inc. v. Se. Alaska Conservation Council*, 557 U.S. 261, 283–84 ("The Memorandum, though not subject to sufficiently formal procedures to merit *Chevron* deference, is entitled to a measure of deference because it interprets the agencies' own regulatory scheme.") (citations omitted); *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 566 (1980) ("The Court has often repeated the general proposition that considerable respect is due the interpretation given a statute by the officers or agency charged with its administration.") (internal quotation and editorial marks and citations omitted).

The plain language of Section 691(b), augmented by agency interpretations of the CAA, show that plaintiff might have favorable circumstances going forward but cannot undo what has been done administratively. Section 691(b) mandated that, as of the date of enactment of the CAA, certain past events would no longer count against applicants for adjustment of status. That mandate implies that the past events in question would stop counting against applications made or pending on or after December 26, 2007. The mandate of Section 691(b) thus would appear to help plaintiff with his naturalization application, if the application were still pending and if the identified past events were the only impediment to naturalization. Nothing in Section 691(b), however, indicates that the CAA went as far as to nullify closed, past adjudications based on circumstances as they

19

existed in the past.  The section addresses biographical "acts or events," not agency "proceedings."  *Cf. Martin v. Hadix*, 527 U.S. 343, 361 (1999) (finding that a provision in the Prison Litigation Reform Act of 1995 that it "shall apply with respect to all prospective relief whether such relief was originally granted or approved before, on, or after the date of the enactment of this title" did not constitute an "express command about its temporal scope").  In other words, Section 691(b) is factually but not administratively retroactive: It only increases the chances of success for pending or future applications by shortening the list of events from someone's past that could make someone inadmissible.  The Court's sense of Section 691(b) is consistent with the general principle that statutes do not have a retroactive effect unless Congress makes clear that it wants that effect.  *See I.N.S. v. St. Cyr*, 533 U.S. 289, 326 (2001);  *Landgraf v. USI Film Prod.*, 511 U.S. 244, 280 (1994).

The lack of retroactivity is important here because it shows how plaintiff's argument under the CAA fails.  In 2005, as the Court explained above, plaintiff was not eligible for permanent resident status.  The permanent resident status that plaintiff received anyway in 2005 was not lawful due to a lack of compliance with all necessary substantive requirements.  Section 691(b) cannot change for plaintiff what actually happened back in 2005; he currently is stuck with an unlawful permanent resident adjustment based on the circumstances of that time.  Section 691(b) might help plaintiff going forward in two ways—either by helping him defeat any attempt at rescission, or by helping him with any reapplication for lawful permanent resident status.  The Court will not speculate on what might happen in the future; it is enough for now to conclude that Section 691(b) does not reach back to edit past administrative proceedings.

For the above reasons, the Court concludes that defendants were correct about the first reason given for denying plaintiff's naturalization.  Plaintiff so far has applied only once for permanent resident status, in 2005; that permanent resident status, while officially granted, was not

lawful based on the circumstances of the time; and the CAA has no retroactive effect on what those circumstances were back in 2005. Consequently, defendants' first reason for denying naturalization suffices to allow the Court to recommend granting defendants' motion and denying plaintiff's cross-motion.

### D. *Deferring on defendants' second reason for denying naturalization*

As the Court discussed above, defendants gave plaintiff a second reason for denying him naturalization: Plaintiff allegedly "committed, incited, assisted, or otherwise participated in the commission of acts of torture or extrajudicial killings," making him inadmissible under 8 U.S.C. § 1182(a)(3)(E)(iii). If Judge Vilardo disagrees with this Court's recommendation about the first reason for denial then the second reason potentially would affect the outcome of the case. In that scenario, the Court would welcome a referral back from Judge Vilardo for further proceedings to address the second reason. If Judge Vilardo does agree with this Court's recommendation, however, then an analysis of the second reason becomes unnecessary. Prudence warrants waiting for the final disposition of the Court's recommendation, to avoid the risk of issuing a needless advisory opinion.

## IV.    CONCLUSION

For all of the foregoing reasons, the Court respectfully recommends granting defendants' motion for summary judgment (Dkt. No. 14) and denying plaintiff's cross-motion (Dkt. No. 12).

## V.    OBJECTIONS

A copy of this Report and Recommendation will be sent to counsel for the parties by electronic filing on the date below. "Within 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations." FRCP 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Any objections must be filed electronically with the Clerk of the Court through the CM/ECF system.

"As a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point." *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (citations omitted); *see also Mario v. P & C Food Markets, Inc.*, 313 F.3d 758, 766 (2d Cir. 2002) ("Where parties receive clear notice of the consequences, failure timely to object to a magistrate's report and recommendation operates as a waiver of further judicial review of the magistrate's decision.") (citation omitted). "We have adopted the rule that failure to object timely to a magistrate judge's report may operate as a waiver of any further judicial review of the decision, as long as the parties receive clear notice of the consequences of their failure to object. The rule is enforced under our supervisory powers and is a nonjurisdictional waiver provision whose violation we may excuse in the interest of justice." *United States v. Male Juvenile (95-CR-1074)*, 121 F.3d 34, 38–39 (2d Cir. 1997) (internal quotation marks and citations omitted).

"Where a party only raises general objections, a district court need only satisfy itself there is no clear error on the face of the record. Indeed, objections that are merely perfunctory responses argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original papers will not suffice to invoke de novo review. Such objections would reduce the magistrate's work to something akin to a meaningless dress rehearsal." *Owusu v. N.Y. State Ins.*, 655 F. Supp. 2d 308, 312–13 (S.D.N.Y. 2009) (internal quotation and editorial marks and citations omitted).

SO ORDERED.

_\_\_\_/s Hugh B. Scott_____
Hon. Hugh B. Scott
United States Magistrate Judge

DATED: June 28, 2018